## MARCH v. EASTERN RAILROAD COMPANY.

The purchaser of a share of stock in a corporation takes the share with all its incidents, one of which is the right to receive all future dividends declared on such shares.

Nor does it make any difference at what times or from what sources the profits thus divided may have accrued; they are an incident to the share to which the purchaser becomes at once entitled, provided he remain a member of the corporation until a dividend is made.

Under a grant from the legislature of this State to the Eastern Railroad in New-Hampshire, to lease the right to use their railroad "to such person or corporation, and upon such terms as they may deem proper," a lease of the right to use said road was executed to the Eastern Railroad Company, a corporation chartered in Massachusetts, which lease contained certain stipulations in relation to the payments of rents and the performance of other things therein specified to be done and performed by both said parties:—*Held*, that although originally the parties to the lease might have fixed upon any terms and conditions they pleased, yet, having fixed and agreed upon certain terms and conditions by the assent of all the stockholders, the directors of both roads are bound, as are the majority of the stockholders in both, to conduct and administer said roads accordingly, and their liability to the stockholders of each road is just the same as though they had been united by act of the legislature upon the same terms and conditions as those contained in the lease.

The provisions of the lease between the Eastern Railroad in New-Hampshire and the Eastern Railroad in Massachusetts, examined and considered:—*Held*, that they do not provide for a union of interests or of capitals between said roads, or an equality of dividends between the stockholders of said corporations.

When two railroads are united under a lease or contract specifying the duties and liabilities of each, neither is restricted or limited in any particular not included in

their contract with each other; each may obtain new legislative grants, and avail itself of additional powers in any way they may find advantageous to themselves, provided these new operations are kept so distinct as not to interfere with the due operation of their agreement with each other.

Such lease or contract between the roads must be construed with reference to the objects proposed by the existing charters of each at the time the lease or contract was made, and its construction or operation can not be affected or changed by any change of the plans, purposes, or objects, of the corporation without or beyond the existing scope of their chartered powers at the time of the making of such lease or contract.

Such roads may, as between themselves, vary the terms of their agreement or contract with each other, and may consent to a different appropriation of the funds, profits, or dividends, from that provided for in the original contract; but stockholders in either road who have not thus assented, may in equity hold both corporations to perform their original contract, and apply their funds and profits in the way provided for in the original contract, so far as relates to themselves.

Hence when the fundamental contract between two roads provides that all disputes between the two roads shall be settled by arbitration, and one road has made an illegal misapplication of funds or profits belonging to both, with the assent of a majority of the other road, if stockholders in the latter road, not thus assenting, bring their bill to recover their share of such profits, this court will enjoin both roads, if necessary, from settling or attempting to settle the claims made by such stockholders by arbitration.

The dividends which are divisible among the shareholders of a corporation must be considered as their own property, and can not be applied by the directors to any purpose not included in their charter or fundamental contract, without the consent of such shareholders.

To constitute an illegal application of the funds or money of a corporation, it is not necessary that there should be any intentional wrong or actual fraud; and to give this court jurisdiction in equity in such a case, the plaintiff need not allege or prove any such actual and willful fraud or collusion on the part of the company or companies, or the directors thereof.

But when the money that should have been divided among the stockholders has been applied by a company or companies to a purpose not warranted by and not within the scope of the charter or fundamental articles of agreement, that constitutes a sufficient illegality to give a court of equity jurisdiction, and such proceedings of a majority of such company or companies, and of the governing body or power thereof in such cases, will be treated in equity as a breach of trust toward the minority, and as a fraud upon them, if they have not assented to such misapplication; and courts of equity will prevent such illegal application of such funds or profits and such fraud and breach of trust, by injunction, and will relieve against it when committed, at the suit of such stockholders as have not assented thereto.

IN EQUITY. The bill is stated in 40 N. H. 548. Answers were filed and evidence taken, and the case was heard on the bill, answers and proofs. Many of the allegations in the bill were admitted, such as the due incorporation of both roads, the lease of the New-Hampshire road, and the terms of that lease, &c. Other allegations of the bill were admitted with some qualification, and others denied. The facts, so far as they are necessary, are here briefly stated; when material, they are more fully stated in the opinion.

The Eastern Railroad in New-Hampshire (which will be designated as the New-Hampshire company) were authorized by statute of July 2, 1839, to lease a part or the whole of their railroad and its appurtenances to such person or corporation, and on such terms as they might deem proper, and it appeared from the lease that on the 18th of February, 1840, the New-Hampshire company, by indenture between them and the Eastern Railroad company (which will be

designated as the Massachusetts company), reciting the act of July 2, 1839, leased their "railroad as now located, or as the same or any part or parts thereof may hereafter be located," and "all branch roads that may be connected therewith," "with the entire right to use the same," &c. ; also, "all real estate, buildings, &c., acquired or constructed for its use," with the right to complete the same as the Massachusetts company may deem needful, at the cost of the New-Hampshire company, with the right on the part of the Massachusetts company to receive tolls, rents, &c. ; to hold for 99 years, yielding and paying therefor as rent, on the same days when the Massachusetts company "shall pay dividends to its own stockholders, a sum of money which shall bear the same proportion to the whole cost and expenses incurred prior to the time of paying said rent in obtaining, making and constructing said railroad in New-Hampshire, which the amount of such dividends of the Massachusetts company to its stockholders shall bear to the whole cost and expenses prior to the same time of obtaining, making and constructing its railroad," "so that the New-Hampshire company shall receive the same percentage on the whole amount of its expenditures as the Massachusetts company shall pay in such dividend on the whole amount of its expenditures in obtaining, making and constructing their respective roads, their branches, depots and appurtenances"; the rent to be paid from the net income of the railroads, to be ascertained as expressed in the fourth article.

The New-Hampshire company agree to complete their road and fixtures, &c., as the Massachusetts company shall require. The Massachusetts company covenant to pay the rent reserved, and to yield up the road at the end of the lease in good condition, &c.

By the fourth article it is provided that out of the gross amount of the income of the roads shall be deducted and paid all charges and expenses that may be incurred by the Massachusetts company in rebuilding and maintaining both roads and their appurtenances, all taxes, rents of all property hired, tolls and charges of ferriage, costs of repairs and renewals of cars, engines, &c., on both roads, costs of fuel, salaries and compensation of all persons employed on the roads, claims for damages done on said roads to persons or property, all costs, expenses and damages for which the Massachusetts company may be liable as common carriers ; all charges and expenses incidental to the business, and interest on any loans to the Massachusetts company from the commonwealth, or otherwise, and all sums required to be paid as a sinking fund for the redemption of such loans ; and out of the balance thus remaining the rent is to be paid as specified in the first article.

And if at any time the Massachusetts company shall not deem it expedient to declare and pay to its stockholders its proportion of said net income as a dividend, it shall nevertheless pay to the New-Hampshire company its ratable proportion of such net income semi-annually.

The Massachusetts company may reserve such sums out of the income or rent of the New-Hampshire company, as the directors vote to be expedient, not exceeding in the whole, at any time, ten

per cent of the capital stock of the New-Hampshire company actually paid in, to be appropriated to the advantage of the New-Hampshire company, and the balance, with interest, at the close of the term to be paid to said New-Hampshire company.

If any disagreement shall arise, it is to be settled by the award in writing of three arbitrators; one appointed by each of the parties, these two to appoint the third; the decision to be final and conclusive in law and in equity upon the matter in controversy.

An additional article provided that the dividends shall be paid in proportion to the capital stock respectively paid in by the stockholders of each road by assessments, at the time of the dividends; and that the amount extinguished by the sinking fund belongs to and at the termination of the lease should be divided between the , Massachusetts company and the New-Hampshire company, in proportion to the capital respectively paid in by assessments by the stockholders in each.

Under this lease the New-Hampshire road was completed and operated by the Massachusetts company, and the income divided without question till July, 1854, when the Massachusetts company ceased to pay any dividends to their own stockholders, or any share of the income to the New-Hampshire company, the net income of both roads having been applied to reduce the large debt contracted by the Massachusetts company, incurred in building a continuous track into Boston, instead of crossing a ferry; in building branch roads, in taking stock in connecting roads, alleged to be for the common benefit of both roads; and by a large defalcation of its treasurer, who was also treasurer of the New-Hampshire company, which was claimed to be a common loss to both.

The vote of the New-Hampshire company supposed to authorize the execution of the lease, passed July 8, 1839, recited that the two companies had, by concurrent votes, " agreed to unite their routes and capitals as a basis of dividends"; and empowered the president and directors to carry into effect this vote, and make such stipulations to effect the true meaning and purpose of said union of said corporations as they should find proper, and authorized the president to sign and affix the seal of the corporation to such instrument as should be necessary, and deliver it. It was alleged that this vote was intended to be in fulfillment of a contract previously made by the New-Hampshire company with certain gentlemen of Boston and Salem, in regard to their subscription to the stock of said railroad, and that without such an arrangement with these men the stock would never have been taken, and the New-Hampshire road could not have been built.

The capital of the Massachusetts company, at the date of the lease, was about $1,600,000. It is now $2,823,400. Its permanent debt was about $500,000. It has been increased to about $3,000,000, of which nearly $1,000,000 was paid in the four years preceding the defendants' answers.

The capital of the New-Hampshire company at the date of the lease was nominally $300,000, of which $180,000 was subscribed, and $10 to $20 on a share was paid. It is now $492,500.

Additional powers have been granted by the legislature to the Massachusetts company, and the defendants allege that this was contemplated by both parties to the lease, and designed to carry out its original purpose.

At the time of the lease the Marblehead branch had been built; since that time the Gloucester, Salisbury and Saugus branches have been built; an interest in the South-Reading Branch and in the Essex Railroad have been acquired, and shares have been taken in the Grand Junction Railroad, by the Massachusetts company; and its route into Boston has been changed, and a continuous track laid. The Great-Falls and South-Berwick Branch has also been built by the concurrent action of the two companies, and leased to them. These changes are alleged to have been made before any of the plaintiffs, except one, became stockholders in the New-Hampshire company; with the knowledge and assent of the directors and the stockholders generally of the New-Hampshire company, and in furtherance of the general objects of the two companies, in good faith, and for the common benefit of both roads. The annual reports of the Massachusetts company contained accounts of the expenditures for these various objects, and were distributed to the stockholders of the New-Hampshire company without any complaint on their part on account of the changes. The dividends up to July, 1854, were made up and paid to the stockholders of the New-Hampshire company, first deducting the interest of the debt incurred in building and purchasing these branches, change of route into Boston, &c., and this so appeared in the annual reports.

No attempt has been made by the New-Hampshire company to collect the rents of the Massachusetts company since 1854, because none of the directors of the New-Hampshire company regarded any rent as due.

The plaintiffs were interested in the stock of the New-Hampshire company at the time of filing their bill, but only one was an owner of shares before June 1859, and he had then only three shares.

The directors of the two companies had made some arrangements, about the time the bill was filed, to submit the claim for rent to arbitrators as is alleged for the sole purpose of a fair adjustment.

It is denied that at the meeting of the New-Hampshire company in 1859, there was fraud in the election of the directors, or illegal voting.

The facts relative to the transfer of shares, and to the proposed arbitration, and other facts incidentally discussed, more fully appear in the opinion.

This cause was very ably argued by the learned counsel on both sides, but the great length of the arguments necessarily prevents their being printed entire, and they can not be condensed without doing them injustice.

*J. W. Emery*, and *W. H. Rollins*, for the plaintiffs.

*I. Perley*, and *W. H. Y. Hackett*, for the defendants.

SARGENT, J. It is claimed in the answers that the amount of stock owned by the plaintiffs is much less than is alleged in the bill. But we find among the evidence a paper agreed to by the parties admitting that the original plaintiffs, and those who have since come in, now own, or did when the case was heard, five hundred and sixty-six shares, which is sufficient for all practical purposes. It is not denied that all the original plaintiffs were owners of stock when they filed their bill, and it appears by said agreed statement that all so remained except March and Haven, and there is no evidence that the purchasers of their stock are not prosecuting this suit for their own benefit in the names of their vendors, who commenced it.

But it is said that none of these plaintiffs, except Jones, are entitled to any of the rents sought to be recovered here, because they did not become owners of their stock until after the 25th of June, 1859, the last day of June upon which transfers of stock carry dividends, and the defendants claim that if this rent should prove to be due, that it would be the duty of both of said roads to hold said rent in trust, for the benefit of those who owned said stock at the time said rent accrued.

But this position is not tenable. The purchaser of a share of stock in a corporation takes the share with all its incidents, and among these is the right to receive all future dividends, that is, its proportionate share of all profits not then divided; and as we understand the law and the usage of such corporations, it is wholly immaterial at what times or from what sources these profits have been earned; they are an incident to the share to which a purchaser becomes at once entitled, provided he remains a member of the corporation until a dividend is made. *Harris* v. *Stevens*, 7 N. H. 454; *Hagur* v. *Dandeson*, 2 Exch. 741; cited by the plaintiffs, are in point. See, also, *Rogers* v. *Huntingdon Bank*, 12 S. & R. 77. There is no evidence that these plaintiffs, or any of them, have been guilty of any fraud upon those of whom they purchased their stock, and fraud is not be presumed.

It seems that the New-Hampshire company and its directors were satisfied that the transfers were sufficient in form, and upon proper authority, and were not fraudulently obtained. " These joint stock companies are bound to look into the title of any one who claims to have stock transferred into his name on the books of the company." Redf. on Railw. 599. These transfers have been entered upon the books of the New-Hampshire company where they now stand. No suggestion has been made to the court by any one interested, that any wrong has been perpetrated in these purchases of stock by the plaintiffs, nor does it appear that any such suggestions have been made to the New-Hampshire company or its directors. It will be in season for the court to inquire into the legality of these transfers of stock, when some party shall claim that he has been imposed upon, and did not know, when he sold his stock, and transferred it to some one of these plaintiffs, what the legal effect of such sale and transfer was to have upon dividends that might afterward

be declared. These defendants are not in a position to make that objection successfully.

The due incorporation and organization of both the defendant companies, the act of the New-Hampshire legislature, authorizing the lease of the New-Hampshire road, the due execution of said lease to the Massachusetts company, and the terms and conditions of the lease, are all admitted.

But the question assuming the most importance of any one involved in this controversy, is in regard to the construction and legal effect of the terms of the lease. The defendants contend that, viewed in the light of the previous votes of the companies in connection with certain agreements made with individuals in relation to subscriptions for stock in the New-Hampshire company, it is to be construed as merely uniting the two roads in one; that on account of the different jurisdictions it was supposed necessary to keep up a separate organization, but that aside from this there was to be a union of interest, of purpose, and of capitals, and an equality of dividends, and upon this theory it is admitted that the affairs of the roads have been heretofore conducted and administered. While the plaintiffs claim that the lease is to be considered as an independent instrument, and that it does not affect a union of capitals or interests between the two roads, but that it is a contract between the different parties having different and perhaps conflicting interests, specifying the rights and duties of each, and confining each to its appropriate sphere, not authorizing any such appropriation of the funds or profits of the companies as has been made in this case by the consent of the majority of both companies, and that therefore these plaintiffs, not having assented, are entitled to recover their share of the rents and profits to which they would be entitled by the terms of the lease.

Under the act of our legislature, authorizing this lease, the New-Hampshire company might lease the right to use their road "upon such terms as they may deem proper." The parties were at liberty, then, originally, to make and conclude their own terms, but those terms having been once fixed upon and incorporated into a contract between the parties, they are thenceforth bound to conduct and administer the affairs of the roads according to such contract; and both roads, and their directors, are bound by the terms of this contract, and are liable to the stockholders for any misapplication of funds or profits, the same, under this contract, that they would be under their charter if they had been united by a direct act of incorporation upon the same terms as those specified in the lease.

The general rules by which written instruments are to be construed, are not in dispute. The whole is to be construed together, and effect is to be given to every part, and no word is to be rejected if effect can be given to it consistently with the intention of the parties. That intention is to be gathered from the deed itself, but the court may and should place itself, so far as may be, in the situation of the contracting parties, by due inquiries as to the situation and condition of the property to be affected and the relations of the parties.

The deed in question purports to be a lease "of the railroad located by the New-Hampshire company, but not constructed, and of any parts thereof which may be afterward located, any branch roads or other roads that may be connected therewith, and the entire right to use the same, and all real estate, buildings, &c., that may be acquired or constructed for their use, and the right to construct and complete the same at the expense of the New-Hampshire company, and to receive all tolls upon it for the term of 99 years; yielding and paying therefor, as the rent thereof, on the same days when the Massachusetts company shall pay dividends to its own stockholders, a sum of money which shall bear the same proportion to the whole expense then incurred in constructing, &c., said railroad in New-Hampshire, which the dividends of the stockholders in the Massachusetts company shall bear to the whole expense of constructing, &c., the Massachusetts road; so that the New-Hampshire company shall receive the same percentage on the whole amount of its expenditures as the Massachusetts company shall pay in such dividend on the whole amount of its expenditures in constructing, &c., their respective roads, branches," &c.; the rent reserved to be paid from the net income of both roads, to be ascertained in the manner specified in the fourth article of said lease.

By the fourth article, it is provided that out of the gross amount of the income of the roads, shall be deducted and paid all charges and expenses that may be incurred by the Massachusetts company in rebuilding and maintaining both roads and their appurtenances; all taxes, rents of all property hired, tolls and charges of ferriage, costs of repairs and renewals of cars, engines, &c., on both roads; costs of fuel, salaries and compensation of all persons employed on the roads; claims for damages done on said roads to persons or property; all costs and damages for which the Massachusetts company may be liable as common carriers; all charges and expenses incidental to the business, and interest on any loans to the Massachusetts company from the Commonwealth, or otherwise; and all sums required to be paid as a sinking fund for the redemption of such loans; and out of the balance thus remaining the rent is to be paid to the New-Hampshire company, as specified in the first article.

It is apparent, from these and the other provisions of this instrument, that it is and was designed to be a lease of their road, by the New-Hampshire company to the Massachusetts company, at a rent to be ascertained in a prescribed way; and that it is not, as contended for by the defendants, an agreement to unite these roads for any purpose. The distinct character of the corporations is kept in view throughout. They stand in the relation of adverse contracting parties, each endeavoring by suitable stipulations to guard and secure its own rights. So that whatever may have been at some time the intention of the parties as to a union of the two roads, this lease accomplished no such object. Its provisions are inconsistent with the idea of union. Its essential idea is that of separation—the distinct existence of the two companies standing in opposition, with adverse rights and interests as lessor and lessee.

The instrument is wholly inconsistent with the idea of "a union of routes and of capitals as a basis of dividends," whatever notion of that kind may at some time have existed in the minds of the directors and corporators. If that had been the object, it would have been perfectly easy to have accomplished it, by simply providing that an equal dividend should always be made to the stockholders of the two roads; but the instrument only provides that the net profits, as ascertained in the way specified in the fourth article, shall be divided between the two roads in proportion to the expenditures on each. But neither stipulated what they would do with the amount thus divided. Either had the power, and, so far as the other was concerned, the right to do what they pleased with it. This part of the agreement, as well as that portion of the fourth article providing that if the Massachusetts company should not declare a dividend to its own stockholders, it should nevertheless pay to the New-Hampshire company its ratable proportion of the net income semi-annually, demonstrate that an equality of dividends, or a union of roads for that purpose, was not provided for or con-contemplated, but it seems to be expressly stipulated and agreed that they might and should stand as distinct and different parties. We are unable to see any substantial grounds to assume that this instrument was any thing different from what it purports to be, a lease of the road of the New-Hampshire · company to the Massachusetts company for a term of years, at a rent to be determined in a way distinctly pointed out, from the net ·income. It is, in fact, just such an instrument as our legislature had authorized the New-Hampshire company to make of their road. They were authorized "to lease a part, or the entire right to use" their road, "to such person or corporation, and upon such terms as they may deem proper."

The theory of the union of the two companies being without foundation, all the arguments, conclusions and inferences deduced from it, fall to the ground.

Let us look, then, at the state of the corporations and at the condition of their railroads and other property at the time of making this contract, and also at their condition since July, 1854, when the last payment of rent was made. And between these two periods of time we shall find that great changes have transpired in the condition of the Massachusetts road. It is alleged in the bill, and not denied in the answers, that at the time of the lease the Massachusetts company had completed its road nearly to the extent of its charter. Its capital stock was then $1,600,000, and its indebtedness only about $500,000, beside some floating debt which is not stated. The Marblehead branch had also been constructed at the date of the lease by the Massachusetts company. But since the lease was made, the route of that road into Boston has been changed, at an expense of more than a million of dollars; and three branches, the Gloucester, Salisbury and Saugus, have been built at an expense of some $500,000; the South-Reading branch has been purchased at an expense of $300,000; and an interest acquired in the Essex railroad at a cost of $264,000 more; and stock has been taken in the

Great-Falls and Berwick branch, and in the Grand Junction railroad, to the amount of some $160,000 more. In this way the stock of this corporation has been increased from $1,600,000, at the date of the lease, to $2,853,400, and its indebtedness has also increased from $500,000 to about $3,000,000, though it is alleged, in the answers, that about $1,000,000 has been paid from the earnings of the roads, since 1854, in discharge of so much of said debt.

It is admitted that the capital stock of the New-Hampshire company, at the date of the lease, was nominally $300,000, though it is claimed that only about two thirds of that amount was actually subscribed, and but a small portion of that had been paid in. The road was then to be constructed and furnished with depots, &c., throughout, the whole cost of doing which has been $492,500, which is the present amount of its capital stock. It is not suggested in the answers, and there is no evidence before us to show that this whole amount has not been properly expended in constructing and furnishing the New-Hampshire road, as it was intended to be done at the date of the lease, and as the Massachusetts company "deemed needful" to have it done; or that the whole amount has not been expended by order and direction of the Massachusetts company under the first article in the lease. A suggestion has, however, been made in the argument, that some changes have been made in the route of the New-Hampshire road which were not in contemplation of the parties at the date of the lease, which we have been asked to consider, in connection with the changes that have been made in the Massachusetts road.

By these operations, it will be seen that the relations of these corporations have been materially changed; the expenditures on the New-Hampshire road bearing a much larger ratio to those on the Massachusetts road when the New-Hampshire road was first completed than they now do, and of course the share of rent to which the New-Hampshire road was then entitled, was proportionably larger than it is now.

We think it clear that, by this contract, the powers of neither of these corporations was restricted or limited in any particular not included in their contract with each other. Each had the right to avail itself of any powers conferred by its charter, and the right to apply to the legislature of their state for additional grants in any way they might find advantageous to themselves, provided these new operations were kept so distinct as not to interfere with the due operation of their agreement with each other. But the lease in this case is to be construed with reference to the objects proposed by the existing charters of each at the time the lease was made, and its construction and operation can not be affected or changed by any change of the plans, purposes or objects of the corporations without or beyond the existing scope of their chartered powers at the time the lease was made.

If the Massachusetts company, for instance, should, by purchase or otherwise, obtain an extension of their road to some point, not in the view of any party at the date of the lease, and should for that purpose obtain an increase of capital, and it should be found that

this addition was more productive than their original road, the New-Hampshire company could have no claim to have the income of this extension brought into the estimate of receipts of the two roads embraced in their original contract; neither could the Massachusetts company, if they had obtained authority to construct or purchase a new road not in contemplation at the date of the lease, nor within their then chartered limits, which afforded no profits, claim to add this addition to their capital, to the expenditures on the two roads, existing at the time the contract was made, and thus compel the New-Hampshire company, without their assent, to share their loss by a bad speculation. To hold that either of these things could be done, would place it in the power of either of the roads to change essentially the terms of their contract, to the disadvantage, perhaps ruin of the other, without giving them the opportunity even to remonstrate. This might no doubt be done by the assent and agreement of both roads, but such assent of the directors or even the majority of the stockholders, would not bind those in either company who had not assented to such new enterprises.

The court can not presume that it was the intention of either party, thus to place themselves in the power of a party thus adversely interested; on the contrary they would be bound to presume that the parties agreed, each so to conduct the business and affairs of their respective corporations as in no respect to interfere with the fair and faithful performance of their contract, according to their original intention.

The principle thus suggested is the same which was adopted by this court in the case of the *Union Locks and Canals* v. *Towne*, 1 N. H. 46. That was an action brought to recover assessments on shares in the plaintiff corporation subscribed for by the defendant. The defense was, that after the subscription, the purpose and scope of the corporation had been materially changed by the grant and acceptance of new corporate powers, and that the defendant's subscription was thereby discharged. It was held that, by acquiring an interest in a corporation, a party enters into a contract the terms of which are limited by the specific provisions, rights and limitations of the act of incorporation. To make a valid change in this contract, the assent of both parties is indispensable. The defendant, having never assented to the additional acts, is not bound by them; consequently the assessments made to advance objects essentially different, or the same objects by methods essentially different, are not within the contract. The acceptance of the act for locking Cromwell's falls, affected a material change in the corporation. After that, the money raised by assessment would be raised not only for the purposes first contemplated, but for constructing a canal in a part of the river wholly without the boundaries included in the first act. Neither the letter nor the spirit of the defendant's contract could extend to the payment of money for an object which was not originally within the contemplation and power of the parties. *Middlesex Turnpike Co.* v. *Locke*, 8 Mass. 268; *Middlesex Turnpike Co.* v. *Swan*, 10 Mass. 384.

An assent of stockholders to amendments changing or extending

the objects, or increasing the powers, or enlarging the liabilities of the corporation in any matter fundamental is not to be presumed but must be proved. There is no proof, in this case, that these plaintiffs or their grantors have ever consented to any change in the contract as originally made between the corporations of which they are members and the Massachusetts company, whatever the directors or a majority of the corporation may have done on their own account. The case above cited we think settles the point that the terms of a contract can not be changed by the act of one of the parties (a corporation) by the acceptance of a new charter, and an acting under it without the assent of the other party. The contract is still to be construed according to its original terms and intention, and if the case admits of it, is to be enforced accordingly, or if the change is of such a character that the contract does not admit of such enforcement, the other party is wholly discharged. So in this case, if the business of the Massachusetts company has been so managed by combining other enterprises not contemplated at the date of the lease of the New-Hampshire road, and without the consent of the New-Hampshire company, so that now it is impossible to separate and ascertain the receipts of the original roads, the contract on the part of the latter might be wholly avoided; but if it would still admit of being performed, it would be construed now as it would have been on the day it was made.

But it is not every change of the corporate powers of a corporation or of its plan of operations, which will affect the validity or the construction of its contract. New powers may be sought, for the purpose of better carrying out the original plan in the original mode substantially, just as they may be sought to accomplish new enterprises beyond the scope of the original powers. So new plans of operation may be adopted with a view to accomplish the original enterprises, as well as to change or modify essentially the whole of the original plan; and we are not aware that it is possible to lay down any rule by which these classes of changes may be discriminated. Each case must be considered and decided upon its own circumstances, having reference to a reasonable construction of the charter, in view of the objects originally undertaken.

In this case, each of the objects which are now charged as essential changes of the original scheme, are to be examined with a view to see if they truly fall within the denomination of essential changes. We think the lease itself shows that both parties to it, when it was made, contemplated the two roads as unfinished. The road in New-Hampshire was unbuilt. "The railroad, with all and singular branch railroads, and other railroads" of the New-Hampshire company, is leased, and the same is to be constructed by the New-Hampshire company, as required by the directors of the Massachusetts company.

There can be no doubt that the Marblehead branch of the Massachusetts road was in contemplation of both parties, as it had already been constructed when the lease was made. This fact may tend to show that it might have been in the view of both that certain modifications of, or additions to the road were proper to be made

within the original purposes of the original grants. It is suggested
that perhaps the Salisbury and Saugus branches might fall within
the same class.   We have not sufficient evidence before us to de-
termine that point, though the fact that the Saugus branch was not
incorporated until April, 1848, would tend to a different conclusion
in regard to that.   How the case would stand with the Gloucester
road we can not tell.   This may, perhaps, more nearly approach to
a distinct enterprise.   The South-Reading, the Essex, and the Grand
Junction roads would seem to present themselves as undertakings
essentially distinct and unconnected with the Massachusetts com-
pany and all its original objects; nor do we readily see how the
new route into Boston can be justly regarded as a mere variation of
the original plan.   All these matters, however, would be proper
subjects of inquiry before any final disposition of the case can be
made by this court.

The Great-Falls and South-Berwick branch is said to have been
built by the concurrent action of both boards of directors.   But it
does not appear that the New-Hampshire company has any interest
in it, nor do we understand that its cost is included in the amount
of stock of the New-Hampshire company; we understand from the
reports that this was all paid by the Massachusetts company.   In
the report of the directors of the Massachusetts company for 1856,
is found the following:   "It (the Great-Falls and South-Berwick
branch railroad) is a short road of six miles in length, and received in
1854 from this company, through the Eastern Railroad in New-
Hampshire, $48,500, in payment for stock and a guaranty on sixty
thousand dollars of their first mortgage bonds, the coupons of which
we have been compelled to pay as they became due.   It is of no
value to this road at present.   And in the report of the directors of
the same company, for 1858, is the following:   "The Great-Falls
and South-Berwick branch railroad is hopelessly involved by law-
suits and executions, and is placed in the possession of trustees, for
the protection of our guaranty."   And the records of the two com-
panies tend to show that whatever aid was rendered to this branch,
was all done in fact by the Massachusetts company through the
New-Hampshire company.   It does not appear that the stockholders
in the New-Hampshire company, or even those in the Massachusetts
company, ever assented to any such operations.   And if this project
was not within the range of objects contemplated at the time of the
lease by the parties, or should it be found to be unauthorized by
proper legislation, it might appear that these plaintiffs should not
lose in consequence of any such expenditures.   But as this also
must be farther investigated, it is not material to state the evidence
more fully.

The court can not avoid the conclusion that the construction of
this contract (the lease in question) contended for by the complain-
ants in this bill, is substantially correct, and that upon its true
reading the Massachusetts company have had no right as against
the plaintiff to apply the income of the roads to the liquidation of
the debts of their company, but were bound, so far as the plaintiffs
were concerned, to pay over to the New-Hampshire company their

proportional part of the income of the roads agreeably to the stipulations of the lease.

There are some other questions raised by the pleadings which require notice. It is charged that the directors were not legally chosen at the annual meeting in 1859, and that the meeting was improperly controlled by votes carried by those who were not *bonâ fide* the owners of the stock they represented. That Goodwin was legally elected is not questioned. Of the rest, those who were declared elected received 1325 votes, and the opposition candidates 592 votes. Forty-five ballots were cast for those declared elected, on lots of exactly twenty shares each, making nine hundred votes cast in that way. If all these votes had been illegal, then those declared elected could not have been legally elected; but there is no evidence that such was the fact. It appears, however, that transfers of lots of twenty shares each, to the number of twenty-nine, equaling 580 votes, were made to sundry individuals on the 11th of July, the day before the annual meeting, and all but one lot from two individuals, and that the persons who thus on these shares cast five hundred and sixty votes, transferred their stock to other hands, as follows: nine lots of twenty shares each, July 15; eight lots, July 20; seven lots, July 22, and four lots, July 29, 1859; which facts, although they may tend to show that a few individuals were guilty of improprieties, yet do not show the election of officers to be illegal.

It is admitted that William S. Tuckerman was treasurer of said Massachusetts company and also of the New-Hampshire company, and that while thus acting he became a defaulter to the amount of about $250,000, which sum has never been recovered. It is also admitted that this money, at the time it was taken and used by said Tuckerman, was the money of the Massachusetts company. But it is denied that this was effected through any neglect of the directors of said company.

But if we rely upon the statements of the investigating committee contained in their report to the stockholders of the Massachusetts company of July 30, 1855, the charge of negligence on the part of the directors would not seem entirely unfounded. This committee ask (page 289, book of reports), " Whether any gentleman who is now or has been a member of the board of directors of this company (possessing, as said board all do, individually and collectively a penetration and shrewdness quite up to the average standard of their fellow-men) deems it at all probable that a clerk of his, even if that director possessed as large a capital as that of this corporation, and did as large a business, could by any possibility go on for a period of at least nine years, using books as loose and irregular as those which we have described, and commit embezzlement after embezzlement without detection, until, for the first time, by the confession of that clerk alone, these embezzlements should burst forth upon him in the full effulgence of a quarter of a million of dollars?" And they add, " We repeat, we sincerely repeat, that we have the fullest confidence in the uprightness and honor of the president and directors of this company, one and all

of them; but to say less than we have said on this topic would be injustice to ourselves and treachery to you." This report contains many valuable facts and suggestions which may be of service in the investigations which it will be necessary to make upon the subjects now under inquiry.

From the above we could by no means conclude that the directors of the Massachusetts company were free from fault in the affair with Tuckerman. Directors of railroads, who have charge of other people's money, should and must be held to exercise the same care, caution, and prudence, which they would be expected to exercise in their own affairs.

But whether the directors were in fault or not, we can not see how the New-Hampshire company can be properly charged with this loss or any part of it. It clearly does not come under the head of "incidental charges and expenses" mentioned in the fourth article of the lease, nor under any of the other items of expense there specified. The fact that Tuckerman was treasurer of the New-Hampshire company could not affect the case either way. If this money had all been in his hands as treasurer of the Massachusetts company, and had then been legally transferred to the New-Hampshire company by vote, or otherwise, as rent or dividends, and the amount had been passed to the credit of the treasurer of the Massachusetts company on the books of that company, and the same man, or any other acting as treasurer of the New-Hampshire company, had received the same and charged himself with it as treasurer of the New-Hampshire company, on the books of said company, and then the money had been lost it would have been the loss of the New-Hampshire company, and for such loss he would have been liable to that corporation upon his official bond to them. But in the case before us he was liable to the Massachusetts company upon his bond to them, and could not, upon the admitted facts in the case, be held liable for any thing on his bond to the New-Hampshire company, because he had not spent improperly any of their money. We see no good reason, then, for charging the New-Hampshire company or its stockholders with any part of this loss.

The question of an arbitration was pretty fully discussed in the former opinion of the court in this case (40 N. H. 548), but the subject is resumed, and re-argued and insisted on in the present hearing. It is argued as though the two corporations had entered into an arbitration before the commencement of this suit, but we find no evidence to sustain that position. This bill was dated, signed, and sworn to, July 16, 1859. The annual meeting of the New-Hampshire company was July 12, 1859, at which directors were chosen who held a meeting the same day, and after the adjournment of the stockholders' meeting, at which meeting of the directors it was voted that the resolution adopted by the stockholders of the New-Hampshire company at their annual meeting held this day, namely, " that the directors of this company be instructed to take immediate steps to recover from the Eastern Railroad company, in the manner provided in said lease, or in such other manner

as they shall judge proper, the amount due us, if any," be referred to a committee which was then duly appointed.

On page twenty-eight, of the answer of the New-Hampshire company, we find a report of this committee of the directors, reciting that they had proposed to recommend the Hon. Joel Parker as an arbitrator, and had called the attention of the directors of the Massachusetts company to the subject; but while the matter was pending a bill in equity in favor of Clement March and others was served upon the New-Hampshire company and its directors, whereupon the committee recommend the following resolutions : "*Resolved*, That the committee be and they hereby are discharged from any further consideration of said subject."   "*Resolved*, That it is inexpedient to take any farther steps in reference to said arbitration, while this subject is pending before the court"; whereupon it was " voted that said report be accepted, and the accompanying resolutions adopted."   At page twenty-nine, of the same answer, it appears that the directors of the Massachusetts company, July 21, 1859 (several days after this suit was commenced), voted that the president select a referee, &c., and immediately after this follows a written agreement without date in which the whole matter is submitted to Judges Parker and Curtis, and signed by the presidents of the two roads.   But it is apparent from the above facts that this agreement to refer was not signed until after this bill was served upon the defendants, so that the argument that this arbitration was entered into before this suit was brought, and therefore that this suit can not be maintained, is without foundation.

But taking the evidence furnished by the New-Hampshire company (and that is all we have on that subject), and it would seem that no legal reference to arbitrators has ever been made at all, at least by the New-Hampshire company, for while it appears that the directors of the Massachusetts company had, by vote, authorized their president to appoint a referee, yet no such authority appears on the part of the New-Hampshire company, and not only so, but the evidence negatives any presumption of that kind that might otherwise arise from the signing of said agreement, by showing a vote of the directors of that road, passed after this suit was commenced, that it was inexpedient to take any further steps in reference to an arbitration, while this bill should be pending before this court.

It is contended that the reference to arbitrators effectually secures the plaintiffs' rights.   But this is certainly a most idle pretense. These plaintiffs are and can be no parties to any such arbitration. They would have no right to present their claim before the arbitrators, nor their views or arguments, nor could the arbitrators properly hear them except as witnesses.   These plaintiffs present claims which they have the right to have adjudicated upon legal and equitable principles, and they have the right to have them decided upon the facts as they stand and as their rights now exist. It is well understood that arbitrators are not bound to decide the questions submitted to them upon either of these grounds, but they may make an adjustment of the controversy in any way that the

parties before them may agree upon, or in any mode which they may deem the most judicious for deciding the controversy. And we think that it is plain that no reference could properly be had to the rights of these plaintiffs, or their views or wishes, before an arbitration to which they were not and could not be parties in any legitimate way. They would, undoubtedly, be left to adjust their controversies elsewhere.

From all the evidence submitted, we are led to the conclusion that the object of the proposed arbitration is, that the defendant companies may settle and conclude these questions where these plaintiffs can not be heard, and where their rights can not be properly protected and vindicated, because we can see no other object to be gained or accomplished by such reference. There is nothing between the two companies to be referred. No controversy or dispute has arisen between them. Their directors, and a majority of the stockholders, have always agreed and still agree in the construction of the lease, and are both satisfied with the management of the roads and with the disposition that has been made of the income and profits of the same. What controversy, then, have these companies with each other, that they should wish to arbitrate ? And we can not blame these plaintiffs for objecting to a reference by which their interests may be incidentally affected and their rights concluded, but to which they could not be legitimate parties.

There seems to be, on the part of the counsel for the defendants, an erroneous view of the nature and objects of this suit. It is represented in the argument as an attempted interference, on the part of the plaintiffs, with the New-Hampshire company, with a view to manage the claims of said company against the Massachusetts company, and to prosecute these claims on behalf and for the benefit of the New-Hampshire company. We understand the matter differently. We regard this as a suit between these plaintiffs on the one side, and the two corporations on the other, to compel the latter to perform their duties growing out of their contract as contained in the lease, that the plaintiffs may be enabled to recover the dividends which have been, as they think, wrongfully withheld from them. They simply ask for justice to themselves and those who may become parties to the suit with them. They seek to carry on no controversy but their own, and to interfere with no one's business or interests but their own, except as such interests may incidentally and unavoidably be involved with their own. If others have different views of their own interests or those of the companies, the plaintiffs do not propose to require any decision of their rights in this proceeding. Their purpose will be answered if the Massachusetts company may be compelled to pay to the New-Hampshire company such part of the rents of the New-Hampshire road as is equitably due to the plaintiffs, that they may recover the same of the New-Hampshire company.

It is claimed by the counsel that unless a charge of actual fraud and collusion, of willful corruption and dishonesty, on the part of the directors of these corporations, or at least of the New-Hamp-

shire company, is made and proved, that this bill can not be maintained. We do not understand that the right of these plaintiffs to prosecute their suit depends necessarily upon any such allegation in their bill or any such proof.

This bill is not understood to rest on any charge of actual fraud or conspiracy, but upon the fact that the defendants misunderstand and misinterpret the rights growing out of their lease, and are disposed to sacrifice the rights of the plaintiffs upon their erroneous views of their duty; and as we understand the answers of both roads, made by their directors or president, they admit and insist that according to their view of the true construction of the lease, out of which this controversy arises, nothing is due to the New-Hampshire company, and they thus leave themselves no alternative but to contend before the arbitrators that they have given to this lease its true construction. They admit substantially that they could not and would not contend before arbitrators for any such decision as these plaintiffs claim that justice to them requires.

We do not understand that, in the charge here made, any moral turpitude or guilt is imputed to the directors of either road. No worse charge is made than that of managing the business of these roads in a manner detrimental to the plaintiffs' interests, in consequence of their mistaken views of the interpretation of the lease, and that the funds belonging to these plaintiffs have been illegally applied by the directors of these companies, for the same reason. It is the common charge implied in every action at law or in equity, that the defendant will not do the plaintiff justice.

In the case of *Salomons* v. *Laing,* 6 Eng. Railway Cases 289, it is held that although the court were satisfied from the evidence that the parties in that case were guilty of actual fraud and collusion, yet that it was not necessary to charge or to find any such guilt; that it was enough to say that they were parties to the same breach of trust, the one paying and the other receiving moneys for an illegal purpose, which moneys are now or ought to be in the hands of the company thus receiving them; that when one company enters into an illegal transaction with another company and makes an illegal payment out of their funds in respect of such a transaction, a shareholder impeaching the dealings of the companies, and seeking to have the money restored to the funds of his own company, is entitled in his own name to maintain a suit against both corporations for that purpose.

And to render the transaction illegal, it is not necessary that there should be any intentional wrong or actual fraud. In *Salomons* v. *Laing,* it is held that "any application of or dealing with the capital or any part of the capital, or any funds or money of the company, which may come under the control or management of the directors or governing body of the company in any matter not distinctly authorized by the act of Parliament," is an illegal application or dealing. And if, as in that case, "the directors are proceeding upon an illegal principle, and for purposes not authorized by the act of Parliament, to involve the company or the shareholders of the company, or any of them, in liabilities to which the

shareholders, or any of the shareholders, never consented, relief may and ought to be given in this court."

It is also there held that the dividends which are divisible among the shareholders must be considered as their own property, and can not be applied by the directors to any purposes not included in the act, without the express sanction of each shareholder.

So in *Stevens* v. *Rutland and Burlington Railroad Company*, 29 Vt. 545, it is said that "it is an admitted principle that in partnerships and joint stock associations they can not, by a vote of the majority, change or alter their fundamental articles of copartnership or association against the will of the minority, however small, unless there is an express or implied provision in the articles themselves that they may do it. It is equally well settled that a court of chancery will, upon the application of an individual member of a partnership or joint stock association, restrain by injunction the majority from using the funds or pledging the credit of the partnership or association, in a business not warranted by and not within the scope of their fundamental articles of agreement. Courts of equity treat such proceedings by a majority as a fraud upon the other members, which they will neither sanction or permit. To prevent the commission of fraud by injunction has been one of the earliest and most appropriate heads of equity jurisdiction, as well as to relieve against it when committed."

In *Coleman* v. *Eastern Counties Railway*, 5 Eng. Railw. Cas. 573, it was held that directors have no right to enter into or to pledge the funds of the company in support of any project not pointed out by their act, although such project may tend to increase the traffic upon the railway, and may be assented to by a majority of the stockholders, and the object of such project may not be against public policy, and that acquiescence by shareholders in such a project for ever so long time, affords no presumption of its legality. *Macedon Plank Road Company* v. *Lapham*, 18 Barb. 312; Redf. on Railw. 92.

In the case before us there has been a misapplication, as it would seem, of the funds, to some part of which these plaintiffs are entitled, to purposes and objects not provided for in their contract between the defendant companies, nor within the scope of the objects then in the contemplation of the parties, which is illegal, and which is treated in law as a breach of trust or as a fraud upon the plaintiffs (whatever the intention of the directors and a majority of the stockholders in the defendant companies may have been) which is the proper subject of inquiry, and for correction by this court in an application like the present.

We find no evidence tending to show, nor is it claimed in the answers, that any sums have been "required to be paid as a sinking fund for the redemption of any such loan or loans," which are to be deducted from the gross income in order to ascertain the net income to be divided, nor that a majority of the directors of the Massachusetts company have voted it expedient to reserve any sum or sums from the net income or rent belonging to the New-Hampshire company to be appropriated for the benefit of the

New-Hampshire company, according to the stipulations of the fourth article of the lease.

The defendants admit that in every year since 1854 the Massachusetts, company has received an income from the New-Hampshire road which exceeded the current running expenses. It seems, therefore, that these plaintiffs will be entitled to recover something from these defendants when they are held to such a construction of the contract between themselves as the court have indicated.

The prayer of the plaintiffs for an injunction upon the defendant roads, restraining them from making any settlement of the matters here in controversy, or from entering into any reference or arbitration of them, without leave of the court, while these proceedings in behalf of these plaintiffs, or any of them, or any who shall legally become parties to the same as plaintiffs, are pending in this court, is granted; and a master is appointed with instructions, in order to ascertain the true amount to which the plaintiffs are entitled.

### INSTRUCTIONS TO THE MASTER.

1. He is to ascertain and report the gross income of the Eastern Railroad company, for each six months from January 1, 1854, to the date of his report, and deduct therefrom, for each six months, only the items specified in the fourth article of the lease. In making up the amount of these items, he will allow nothing for contribution to a sinking fund, nothing for losses by Tuckerman the defaulting treasurer, and nothing for interest paid by the Eastern Railroad company beyond the interest on the amount of the debt due at the date of the lease, or such increase thereof as was occasioned by the completing and furnishing the road as authorized at the date of the lease, and by the construction or purchase of such branch roads or additions as were fairly within the scope of their charters at the date of the lease, and of the objects then in contemplation of the parties. The balance thus found will be the net income.

2. He will ascertain and report whether any, and if any, what portion of the net income received by the Eastern Railroad company for each six months from January 1, 1854, to date of his report, has accrued from new enterprises engaged in, new contracts made, or property acquired by said Eastern Railroad company since the date of the lease and not within the scope of its chartered powers at said date; and deduct that amount, if any, from the whole net income of the Eastern Railroad company, for each of said periods of six months.

3. He will ascertain and report the share of said net income which should have been paid to the Eastern Railroad in New-Hampshire, for each six months during the same time. In ascertaining that amount, there is to be allowed to the Eastern Railroad company only the amount of stock issued at the date of the lease, with such additional issues as have been occasioned by the finishing and furnishing their railroad, as authorized at the date of their lease, and by the building or purchase of such branches or additions as were fairly within the scope of their charters, and of the objects in contemplation of the parties at the date of the lease.

4. He will cast interest on the amount that should have been paid to the Eastern Railroad in New-Hampshire, from the time when it should have been paid to the date of his report.

5. He will ascertain and report the amount of stock in the Eastern Railroad in New-Hampshire, January 1, 1854, and since, and dividing the net profits due to the New-Hampshire road equally upon all its stock, he will find and report the share of said income which would thus belong to each plaintiff.

6. He will also ascertain and report whether the Eastern Railroad in New-Hampshire, since the date of said lease, has made any, and if any, what alterations in or additions to its track or capital not within the scope of its chartered powers when said lease was given, and not then in the contemplation of the parties; and also to what extent said alterations and additions have increased the capital stock of said road; and whether such alterations or additions have increased the profits or net income of said Eastern Railroad in New-Hampshire, and if so, how much for each six months since January 1, 1854; and whether or not said alterations or additions have been made by the Eastern Railroad company, or by their order, procurement, or requirement; and whether or not the net profits thereof, if any, have been realized, have been received and are still held by the said Eastern Railroad company.

7. He will, on request of either party to this proceeding, report to the court all the facts upon which he shall base his finding, on either of the points or particulars aforesaid.

8. And for the better discovery of the matters aforesaid, the parties are to produce before the master, upon oath, all deeds, books, papers, and writings, in their custody or power, relating thereto, and are to be examined upon interrogatories as the said master shall direct; and if, in ascertaining said facts, any special matter shall arise, the master may state the same to the court.

9. All objections to the draft of the report not made to the master, within seven days after the same shall be ready for the examination of the parties, and notice thereof given, or within such further time as shall be allowed by the master, shall be deemed to be waived.

10. Leave is given to the parties to apply for further instructions should they be found necessary.